# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50285 | **DATE** | 9/11/2003 |
| **CASE TITLE** | Coil vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated on the attached Report and Recommendation, it is the recommendation of the Magistrate Judge that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |

number of notices

SEP 12 2003
date docketed

9/11/2003
date mailed notice

sp
courtroom deputy's initials

Date/time received in central Clerk's Office

sp
mailing deputy initials

Document Number

18

U.S. DISTRICT COURT
CLERK
03 SEP 12  AM 10: 22
FILED-WD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

RICKY COIL,                           )
                                      )
    Plaintiff,    )    **Case No. 02 C 50285**
                                      )
    v.             )    **Magistrate Judge**
                                      )    **P. Michael Mahoney**
JO ANNE B. BARNHART,                  )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
    Defendant.     )

## REPORT AND RECOMMENDATION

    Ricky Coil ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 416, 423. This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C. 636(b)(1)(B).

## I.    BACKGROUND

    Plaintiff filed for DIB on June 2, 2000, alleging disability on August 24, 1999. (Tr. 86-88). Plaintiff's application for benefits was denied on September 14, 2000. (Tr. 47-50). On September 18, 2000, Plaintiff filed a request for reconsideration. (Tr. 51). Plaintiff's request for reconsideration was denied on December 7, 2000. (Tr. 53-55). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 15, 2000. (Tr. 56). Plaintiff appeared, with counsel, before an ALJ on December 12, 2001. (Tr. 22-44). In a decision dated February 18, 2002, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 15-21). On April 12,

2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 7-11). On June 7, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 4-5).

## II.  FACTS

Plaintiff was born on May 8, 1961. (Tr. 86). He was forty years old at the time of his December 12, 2001 hearing before the ALJ. (Tr. 22). Plaintiff is five feet eleven inches tall and weighs two hundred and fifty pounds. (Tr. 200). At the time of the hearing, Plaintiff was living with his wife and three minor children. (Tr. 27). Before suffering his injury, Plaintiff was employed as a forklift driver and warehouseman at Americold Logistics in Rochelle, Illinois. (Tr. 27, 112). Plaintiff has a ninth grade education. (Tr. 112). He attempted to obtain his GED several times, but has been unsuccessful. (*Id.*). Plaintiff reads at a seventh grade level, spells at a third grade level, and his arithmetic is at a fifth grade level. (Tr. 113). Thus, according to Ronald Gehrig, a vocational rehabilitation specialist, Plaintiff is considered illiterate. (*Id.*).

Plaintiff testified he was injured on February 18, 1999. (Tr. 28). However, he continued working until August 24, 1999, when Plaintiff's surgeon, Dr. Ghanayem M.D., advised him to discontinue employment. (*Id.*). Plaintiff also testified that he underwent an unsuccessful anterior spinal fusion. (*Id.*). At Plaintiff's hearing, Plaintiff's attorney stated that there is a pending malpractice case against the presiding surgeon Dr. Ghanayem. (*Id.*).

Plaintiff testified that doctors have suggested that he undergo additional surgery. (Tr. 30). Plaintiff decided against additional surgery because his first surgery failed and because doctors have advised him that another surgery would only have a one in two chance of improving his condition. (*Id.*).

At the time of the hearing, Plaintiff was smoking a pack and a half a day. (Tr. 29). Plaintiff

2

denied that any of his doctors informed him that smoking interferes with the fusion, but admitted that he was aware of that fact since late in 2000. (*Id.*). Plaintiff testified that he attempted to quit smoking, but that he had not sought medical assistance to that end. (Tr. 29-30).

Plaintiff also testified that the surgery has and continues to cause him a lot of pain in his lower back and both legs. (Tr. 30). Plaintiff testified that the pain is mostly in the outer region of his thighs and that this pain "gets so bad" that it prevents him from walking or standing. (Tr. 34). Plaintiff was then questioned on how long he could walk, stand, or sit at one time. Plaintiff stated that the furthest he could walk is two hundred feet, the longest he could stand is five to ten minutes, and the longest he could sit is fifteen to thirty minutes. (Tr. 34-35). Plaintiff was also asked how he arrived at the hearing. (Tr. 33). Plaintiff testified that he drove from Rochelle to Rockford, a distance of about 30 miles.[1] (*Id.*). According to Plaintiff, this distance represents the furthest he has driven in the year prior to the hearing. (*Id.*). Plaintiff does have a disabilities parking placard. (Tr. 255).

Plaintiff also testified that the surgery caused infections at the surgical site - his belt line. (Tr. 36). Plaintiff has undergone three surgeries to treat the infections. (*Id.*). Plaintiff further testified that the infection prevents him from wearing jeans and slacks, thus limiting his options to loose fitting sweats or waistband-type shorts. (*Id.*).

To combat the pain Plaintiff experiences in his lower back and legs, Plaintiff's treating physician, Dr. Hartman M.D., prescribed Narcol. (Tr. 31). Plaintiff also uses an E-stem unit. (Tr.

---

[1]Upon examination by his attorney, Plaintiff testified that on his way to Rockford, he had to stop in New Milford to stretch out and lay down in his van for a while. (Tr. 41). The distance from Rochelle to New Milford is twenty-three miles. The distance from New Milford to Rockford is eight miles. (Available at http://www.mapquest.com (last visited July 29, 2003)).

35). However, Plaintiff did not have the unit with him at the hearing and he testified that he had not been using the unit for about a week because there was a problem with it. (*Id.*).

When Plaintiff was asked by the ALJ to describe his daily activities, Plaintiff stated that "[I] really don't do much of anything." (Tr. 34). He testified that by the time he gets out of bed and takes a shower, his legs are "burning so bad" that he has to lay or recline on the couch. (*Id.*). Plaintiff claimed that he spends almost all day lying down and he estimated that in total, he only sits up for three hours a day. (Tr. 36). Plaintiff also alleged that he has problems sleeping. (*Id.*). He testified that because of the pain, he can only sleep two to three hours at a time, that he constantly wakes up, and that it is difficult for him to fall back to sleep. (Tr. 36-37).

The ALJ then consulted vocational expert Frank Mendrick. (Tr. 37-41). The ALJ directed Mr. Mendrick to assume an individual with Plaintiff's vocational characteristics[2] and the following limitations:

> He can sit up to a half hour at a time, then he has to get up and walk around. He can stand for a half hour at a time, then he has to sit down. He can walk for half an hour at a time, and then he has to either change his position to standing or sitting. During a typical 8-hour workday he could be seated a total of 3 hours. He could stand a total of three hours. He could walk up to two hours . . . He can push and pull with his right and left upper extremities to an occasional extent. The same thing with operating foot controls. He should not climb, stoop, kneel, balance, crouch, or crawl. He may occasionally reach above his shoulders.

(Tr. 37-38). The ALJ then asked Mr. Mendrick whether there was work in the local, national, or regional economies that such an individual could perform. (Tr. 38). Mr. Mendrick testified that sixty percent of the jobs that exist in the light level of exertion are lost due to the postural limitations.

---

[2]Plaintiff completed the ninth grade, which is classified as a "limited education", and his past relevant work was "unskilled". (Tr. 20).

(Tr. 39). However, he stated that at the light exertion level, there are jobs such as ushering (1,200 jobs in the Chicago metropolitan area plus Warren and Winnebago Counties), inspections and testing (2,000 jobs in the Chicago metropolitan area plus Warren and Winnebago Counties), and cashiering (2,000 jobs in the Chicago metropolitan area plus Warren and Winnebago Counties) that an individual with Plaintiff's vocational characteristics and limitations could perform.[3] (Id.).

The ALJ then asked Mr. Mendrick to reconsider the same individual but with less limited postural capabilities. (Tr. 40). This individual could occasionally climb, stoop, kneel, balance, crouch, and crawl. (Id.). Mr. Mendrick testified that the enhanced capabilities would raise the number of cashiering jobs to 4,000, and the number of inspection and testing jobs to 3,000. (Id.). Moreover, he cited mail clerk (2,100 jobs in the Chicago metropolitan area plus Warren and Winnebago Counties) as another job that such an individual could perform.[4] (Id.).

## III.  MEDICAL HISTORY

On September 8, 1999, Plaintiff was examined by Dr. Ghanayem, M.D., chief of Loyola University Health System's Division of Spine Surgery, Chicago, Illinois. (Tr. 163-164). This was a pre-surgical visit in anticipation of an anterior spine fusion at L5-S1.[5] (Tr. 163). Plaintiff complained of back, buttock, and thigh pain. (Tr. 164). Dr. Ghanayem reported that a magnetic resonance imaging ("MRI") scan of Plaintiff's spine revealed that Plaintiff suffered from foraminal

---

[3]Mr. Mendrick testified that the number of jobs he cited takes into consideration the sixty percent reduction due to the postural limitations. (Tr. 40).

[4]Upon examination by Plaintiff's attorney, Mr. Mendrick testified that assuming Plaintiff's pain requires him to spend most of his time laying down, he could not perform any of the cited jobs. (Tr. 43).

[5]An operative procedure to accomplish a bony ankylosis between two or more vertebrae. STEDMAN'S MEDICAL DICTIONARY 696 (26th ed. 1995).

stenosis[6] and degenerative disk disease at L5-S1. (Tr. 164-165). Dr. Ghanayem also reported that Plaintiff experienced pain when executing a lumbar extension. (*Id.*). Plaintiff's lumbar paraspinal region was also painful. (*Id.*).

On September 28, 1999, Plaintiff underwent a L5-S1 anterior spinal fusion at Loyola University Medical Center. The procedure also involved the placement of bone cages and bone grafts.[7] (Tr. 135-139). After surgery, Dr.Ghanayem reported that the procedure was completed without complications and that Plaintiff's neurological exam was intact. (Tr. 135). Three days later, Plaintiff was discharged and prescribed Vicodin for the pain. (*Id.*). He was also advised not to engage in any heavy lifting or strenuous activity. (*Id.*).

On October 16, 1999, Plaintiff underwent a computerized tomography ("CT") scan[8] of his lumbar spine at Loyola University Medical Center. (Tr. 162). The scan revealed post-surgical changes for fixation of L5-S1 and a centrally herniated disc. (*Id.*). There were no definite abnormalities noted. (*Id.*). However, on October 23, 1999, Plaintiff was admitted to the emergency room at Loyola University Health Center. (Tr. 141-145). Plaintiff was treated for a superficial skin infection in his abdomen area, the surgical site for his spinal fusion on September 28, 1999. (Tr. 141).

---

[6]A narrowing of an aperture or perforation through a bone or a membranous structure. STEDMAN'S MEDICAL DICTIONARY 674, 1673 (26th ed. 1995).

[7]Bone transplanted from a donor site to a recipient site. STEDMAN'S MEDICAL DICTIONARY 741 (26th ed. 1995).

[8]Imaging anatomical information from a cross-sectional plane of the body. Each image is generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane. The scan yields digital images of both bone and soft tissue. STEDMAN'S MEDICAL DICTIONARY 1819 (26th ed. 1995).

On October 26, 1999, Plaintiff had a follow-up visit with Dr. Ghanayem at Loyola University Health Center. (Tr. 160). Dr. Ghanayem reported that Plaintiff's surgical wound "appeare[ed] to be doing well." (Id.). He also reported that Plaintiff was having some bilateral buttock discomfort proximally, but that he was not experiencing any radicular pain in his legs. (Id.). Furthermore, Plaintiff was not experiencing bowel dysfunction or constipation. (Id.). Plaintiff did report problems with urination, but he did not complain of any burning. (Id.). Finally, Dr. Ghanayem reported that a CT scan revealed good positioning of both of Plaintiff's cages. (Id.).

On November 10, 1999, Dr. Lomasney M.D., radiologist at Loyola University Medical Center, took X-rays of Plaintiff's lumbar spine. (Tr. 158). The X-rays showed two bone graft cages at L5-S, a stable degree of disc height loss at L5-S1, anatomic alignment of Plaintiff's vertebrae, no signs of fracture deformity, and a very small spur superior at the L3 end-plate.[9] (Id.). Dr. Lomasney's impression was status post lumbosacral[10] fusion with stable alignment. (Id.).

After taking the X-rays, Plaintiff was again examined by Dr. Ghanayem. (Tr. 157). Dr. Ghanayem reported that Plaintiff's symptoms were unchanged since his visit on October 26, 1999, and that his cages were in good position. (Id.). Dr. Ghanayem ordered that Plaintiff begin physical therapy and prescribed Naprosyn[11] and Elavil[12] for his symptoms. (Id.).

---

[9]The ending of a motor nerve fiber in relation to a skeletal muscle fiber. STEDMAN'S MEDICAL DICTIONARY 572 (26th ed. 1995).

[10]Relating to the lumbar vertebrae and the sacrum. STEDMAN'S MEDICAL DICTIONARY 998 (26th ed. 1995).

[11]A nonsteroidal anti-inflammatory analgesic agent used in the treatment of rheumatoid conditions. STEDMAN'S MEDICAL DICTIONARY 1176 (26th ed. 1995).

[12]A brand name for Amitriptyline, a anti-depressant agent with mild tranquillizing properties used in the treatment of mental depression and sleeping disorders. STEDMAN'S

On December 4, 1999, Dr. Azar-Kia M.D., radiologist at Loyola University Medical Center, administered an MRI scan of Plaintiff's lumbar spine. (Tr. 156). Dr. Azar-Kia reported changes at the level of the L5-S1 disc. (*Id.*). Dr. Azar-Kia attributed this change to Plaintiff's spinal fusion surgery. (*Id.*). Dr Azar-Kia also found a slight bulging disc and some evidence of scar formation. (*Id.*). There was no evidence of a herniated disc or spinal stenosis. (*Id.*).

On December 9, 1999, X-rays of plaintiff's lumbar spine were again taken by Dr. Horowitz M.D., radiologist at Loyola University Medical Center. (Tr. 155). Dr. Horowitz found that there had been an anterior inter-body fusion by metal surgical cages at L5-S1. (*Id.*). She also found that the height of the L5-S1 disc space was well maintained and that the position of the surgical cages was satisfactory. (*Id.*).

On December 15, 1999, Plaintiff returned to Dr. Ghanayem for a follow-up examination. (Tr. 154). Dr. Ghanayem reported that Plaintiff was making progress in physical therapy, that there were no neurological deficits in his lower extremities, and that a MRI scan revealed the usual post-operative changes at L5-S1. (*Id.*). However, Dr. Ghanayem did note that Plaintiff had some tenderness at the base of his lumbar spine. (*Id.*). Dr Ghanayem ordered Plaintiff to continue with his physical therapy and to obtain an epidural injection to treat his radiculitis. (*Id.*).

On January 13, 2000, Plaintiff was again examined by Dr. Ghanayem. (Tr. 153). Dr. Ghanayem reported that Plaintiff was progressing in physical therapy, but that he still needed to improve on his general strength, conditioning, and standing and sitting endurance. (*Id.*). X-rays of Plaintiff's lumbar spine indicated that his fusion construct was stable. (Tr. 152-153). Dr. Ghanayem ordered Plaintiff to continue physical therapy for three weeks, and then to begin work conditioning

---

MEDICAL DICTIONARY 61 (26th ed. 1995).

for an additional three weeks. (Tr. 153).

On March 7, 2000, Kevin Camden, Plaintiff's physical therapist in Belvidere, Illinois, transmitted Plaintiff's progress report to Dr. Ghanayem. (Tr. 183). The report indicated that Plaintiff was receiving physical therapy for his back rehabilitation five times a week. (*Id.*). The report also indicated that Plaintiff complained of varying degrees of back pain, with pain increasing during trunk flexion activities. (*Id.*). Plaintiff could tolerate ambulation for longer periods, but he continued to have burning in his lower extremities. (*Id.*). Mr. Camden also reported that Plaintiff's trunk extensor was good, that his upper abdominal strength was good, and that his lower abdominal strength was fair. (*Id.*). Overall, Mr. Camden believed that Plaintiff's endurance was slowly increasing, but noted that Plaintiff continued to experience pain. (*Id.*).

On March 9, 2000, Plaintiff was again examined by Dr. Ghanayem, who reported that the physical therapy was improving Plaintiff's condition in terms of strength, mobility, and physical attributes. (Tr. 151). However, like Mr. Camden, Dr. Ghanayem noted that Plaintiff was continuing to have symptoms of pain. (*Id.*). He also reported that Plaintiff had some tenderness at the base of his lumbar spine. Neurologically, Plaintiff had no deficits and X-rays revealed that Plaintiff's cages were in good position. (*Id.*).

On March 17, 2000, Plaintiff was examined by Dr. Akuthota M.D., a rehabilitation medicine doctor at Loyola University Health Center. (Tr. 149-150). Plaintiff characterized his pain as a dull, aching sensation that occurred with any kind of movement. (Tr. 149). He also indicated that the pain becomes more severe when he is in a sitting position. (*Id.*). Plaintiff did not report problems with bowel or bladder functions or any new strength loss. (*Id.*).

Dr. Akuthota reported that while Plaintiff had adequate strength throughout his back and legs,

his bilateral standing balance was poor. (*Id.*). He also reported that Plaintiff's lumbar spine motion was limited both in flexion and extension by twenty five percent. (*Id.*). Plaintiff's leg raising test was limited and equivocally negative. (*Id.*). Plaintiff's hip and knee range of motion were also limited. (Tr. 149-50). Dr. Akuthota's diagnosis was myofascial pain[13] and status post lumber fusion. (Tr. 150). Dr. Akuthota gave Plaintiff an off-work slip until April 14, 2000, and advised him to focus on his physical therapy and neutral lumbar stabilization programs. (*Id.*).

On April 12, 2000, Mr. Camden, Plaintiff's physical therapist, transmitted another progress report to Dr. Ghanayem. (Tr. 181-82). Mr. Camden stated that Plaintiff's trunk flexion was improving, but that his trunk extension and side bending remained the same. (Tr. 181). Plaintiff was able to tolerate aerobic activities, but he experienced significant increased pain with prolonged ambulation. (Tr. 181-82). Mr. Camden opined that Plaintiff would continue to improve with continued strengthening and conditioning. (Tr. 182). However, he also stated that Plaintiff will be left with some degree of pain and lost function regardless of his rehabilitation. (*Id.*).

On April 20, 2000, Plaintiff returned to Dr. Ghanayem for a follow-up examination. (Tr. 148). Plaintiff continued to have subjective complaints of low back pain. (*Id.*). Dr. Ghanayem observed that Plaintiff had tenderness with no associated spasm at the base of his lumbar spine. (*Id.*). He also stated that Plaintiff had no neurological deficits and that X-rays revealed that his cages where in good position. (*Id.*). Dr. Ghanayem's opinion was that Plaintiff should return to work, but that he should be restricted to driving a forklift. (*Id.*).

On April 25, 2000, Plaintiff was examined by Dr. Porter M.D., at WorkersFirst in Rockford,

---

[13]Pain in the fibrous tissue that encloses muscles and groups of muscles, and separates their several layers or groups. STEDMAN'S MEDICAL DICTIONARY 628 (26th ed. 1995).

Illinois, for an evaluation of his chronic low back pain. (Tr. 238-41, 249-50, 252-53). Dr. Porter opined that, given Plaintiff's job description, Plaintiff should not return to work. (Tr. 238). Dr. Porter recommended that Plaintiff continue physical therapy with Mr. Camden. (*Id.*). He also recommended and approved a Transcutareous Electrical Nerve Stimulation ("TENS") unit. (Tr. 232).

On April 26, 2000, Plaintiff returned to Dr. Ghanayem for a follow-up examination. (Tr. 147). Plaintiff told Dr. Ghanayem that he was admitted to the emergency room the night before for treatment of swelling around his abdominal incision. (*Id.*). He was prescribed Rocephin[14] and advised to follow up with Dr. Ghanayem. (*Id.*). Dr. Ghanayem observed that Plaintiff had some fulness which was palpable but not significantly tender around the abdominal incision. (*Id.*). His medical impression was that Plaintiff had an incisional hernia. (*Id.*).

On May 31, 2000, Cindy Shattuck, a physical therapist at Belvidere Physical Therapy, Belvidere, Illinois, transmitted a progress report to Dr. Porter. (Tr. 179-180). The report indicated that Plaintiff believed that he was benefitting from the therapy, that he could ambulate with greater ease, but that his symptoms were exacerbated from an increase in activity the previous week. (Tr. 179). Ms. Shattuck reported that Plaintiff improved his range of motion, but that he continued to complain of pain with burning down the leg. (Tr. 180).

On June 13, 2000, Mr. Camden reported to Dr. Porter that Plaintiff was making very slow progress in his rehabilitation. (Tr. 178). According to Mr. Camden, Plaintiff exacerbated his condition several times, the most recent was the infection of his abdominal surgical incision. (*Id.*).

---

[14]A semisynthetic parenteral cephalosporin antibiotic. STEDMAN'S MEDICAL DICTIONARY 297 (26th ed. 1995).

Mr. Camden's opinion was that Plaintiff's recovery would be limited as long as his pain persisted. (*Id.*). On June 22, 2000, Plaintiff underwent a functional capacity evaluation with Mr. Camden. (Tr. 169-176). Mr. Camden concluded that Plaintiff qualified for light-medium work. (Tr. 176). Plaintiff's endurance projections were that he could lift thirty-five pounds occasionally, fifteen pounds frequently, and five pounds constantly. (Tr. 174). Mr. Camden also reported that Plaintiff had periods of right foot-drop.[15] (Tr. 176).

On July 27, 2000, at the request of Plaintiff's workers' compensation insurance carrier, Plaintiff was examined by Dr. Spencer M.D. at The Spine Center in Park Ridge, Illinois. (Tr. 184-85). Plaintiff told Dr. Spencer that he was experiencing back pain and burning in his legs and that these symptoms were getting progressively worse since his surgery on September 28, 1999. (Tr. 184). According to Plaintiff, at rest and recumbency, his pain is abated, however, when he moves, his pain increases. (*Id.*). Dr. Spencer reported that Plaintiff has not had neurological symptoms of bowel or bladder dysfunction or weakness in his lower extremities. (*Id.*). Dr. Spencer also observed that Plaintiff was not in acute discomfort as he sat comfortably in the examining room, that he had normal standing contour in his torso, and that he walked without a limp. (*Id.*). Plaintiff did have increasing complaints of pain with rotation and side bending of his lumbar spine. (Tr. 185). Upon examination of Plaintiff's X-rays and MRIs, Dr. Spencer concluded that there was clear evidence of a failure to achieve a solid fusion at L5-S1.[16] (*Id.*). Dr. Spencer opined that Plaintiff's pain was

---

[15]Paralysis or weakness of the dorsiflexor muscles of the foot, as a consequence of which the foot falls, the toes dragging on the ground in walking. STEDMAN'S MEDICAL DICTIONARY 297 (26th ed. 1995).

[16]According to Dr. Spencer, "[e]xperience is teaching us that the stand alone anterior cages as were performed on [Plaintiff] are having a high degree of non-unions and failures of fusions." (Tr. 185).

caused by the failure to achieve the fusion. (*Id.*). Dr. Spencer proposed two alternatives. Plaintiff could either persist in continued guarded activity and symptomatic treatment with the hope that the cages will continue to subside and ultimately spontaneously fuse, or he could have a posterior fusion with pedicle, plates, and screws. (*Id.*).

On July 31, 2000, state agency medical consultant Dr. Albright M.D. completed a Residual Functional Capacity ("RFC") Assessment. (Tr. 220-227). Dr. Albright's assessment was that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 221). She opined that with normal breaks, Plaintiff could stand, walk, or sit for about six hours in an eight hour day. (*Id.*). She also opined that Plaintiff had the functional ability to stoop and crouch occasionally. (Tr. 222).

On August 8, 2000, at the request of the state disability examiners, Plaintiff underwent a psychological consultative examination with Dr. John Peggau Psy.D. in Rockford, Illinois. (Tr. 186-189). Dr. Paggau reported that Plaintiff obtained a Full-Scale I.Q. score of 88, placing him in the thirtieth percentile. (Tr. 188). He also noted that Plaintiff's vocabulary skills were remarkably good. (Tr. 187). Dr. Paggau found that there were no psychological problems that would interfere with his ability to work with co-workers, supervisors, or the public. (Tr. 188).

On September 8, 2000, Plaintiff was examined by Dr. Zdeblick M.D. at the University of Wisconsin Hospitals and Clinics in Madison, Wisconsin. (Tr. 199-200). Plaintiff's chief complaints were low back pain, bilateral thigh pain, and left foot pain. (Tr. 199). Dr. Zdeblick observed that Plaintiff was moderately obese and that he moved with discomfort around the examining room. (Tr. 200). Upon examination, Plaintiff walked with a slightly wide-based gait, but with normal reciprocating fashion. (*Id.*). Plaintiff was able to heel and toe walk with no difficulty. (*Id.*). Plaintiff had some tenderness to palpation in the area of L5-S1, but he was not hypersensitive to light

touch. (*Id.*). Dr. Zdeblick also reported that Plaintiff was able to forward flex to forty-five degrees with an increase in pain and was able to extend to twenty degrees with a significant increase in pain. (*Id.*). Plaintiff was also able to lateral bend to thirty degrees bilaterally with moderate increase in pain. (*Id.*). Dr. Zdeblick also reported that Plaintiff had some difficulty maintaining full muscle strength exertion secondary to pain in his back, but that he was able to demonstrate five out of five strength in each individual muscle group for at least a brief period of time. (*Id.*). Dr. Zdeblick's diagnosis was probable pseudoarthrosis[17] at L5-S1. (*Id.*). Dr. Zdeblick also ordered a bone scan. (*Id.*). The results of the scan were normal. (Tr. 202).

On October 3, 2000, at the request of the Bureau of Disability Determination Services, Dr. Spencer completed a Spinal Disorder report. (Tr. 204-05). Dr. Spencer diagnosed Plaintiff with back pain and sciatica,[18] and his radiological finding was a failed fusion at L5-S1. (Tr. 204). Dr. Spencer did not find evidence of nerve root compression, but he indicated that lateral flexion and rotation were painful. (Tr. 205). Dr. Spencer also found that Plaintiff's lumbar spine flexion was at thirty degrees, which is significantly lower than the normal range of ninety degrees. (*Id.*). Plaintiff's extension was also thirty degrees, which was in the normal range. (*Id.*). Dr. Spencer concluded that Plaintiff was limited to sedentary work until he had further surgery. (*Id.*).

On July 3, 2001, Dr. Porter of WorkersFirst in Rockford, Illinois, completed an Estimation of Physical Capacities report. (Tr. 256-57). Dr. Porter reported that Plaintiff's ability to

---

[17]A new, false joint arising at the site of an ununited fracture. STEDMAN'S MEDICAL DICTIONARY 1449 (26th ed. 1995).

[18]Pain in the lower back and hip radiating down the back of the thigh into the leg. It is usually caused by a herniated lumbar disk comprising the L5 or S1 root. STEDMAN'S MEDICAL DICTIONARY 1580 (26th ed. 1995).

14

continuously sit, stand, or walk was limited to half an hour at a time. (Tr. 256). Assuming that Plaintiff could change positions as needed, Dr. Porter opined that Plaintiff could sit for three hours, stand for three hours, and walk for two hours during a typical work day. (*Id.*). Furthermore, Dr. Porter reported that Plaintiff was limited to lifting ten pounds occasionally during a typical workday. (*Id.*). Dr. Porter did not find any restrictions on Plaintiff's abilities in handling, grasping, or feeling.[19] (*Id.*). However, he stated that Plaintiff could not push or pull more frequently than thirty-three percent of a normal workday, and that he could not operate foot controls more frequently than five percent of a normal workday. (*Id.*).

Dr. Porter completely restricted Plaintiff from climbing, stooping, kneeling, balancing, crouching, crawling, being in proximity to moving mechanical parts, or working in high exposed places. (Tr. 257). Plaintiff could reach above his shoulders only occasionally. (*Id.*). He could also reach forward only occasionally if trunk flexion is required. (*Id.*). However, Dr. Porter did not restrict Plaintiff from the type of reaching involved in desk top work. (*Id.*). Dr. Porter's opinion was that Plaintiff had achieved maximum medical improvement. (*Id.*).

On April 1, 2002, Dr. Hartman M.D., Plaintiff's family physician, reported that Plaintiff is always in pain due to his chronic back condition. (Tr. 272). Dr. Hartman stated that "[w]hile [Plaintiff's] range of motion is better on some days than other days, back pain ,mild to severe, is always present." (*Id.*). Dr. Hartman's opinion was that Plaintiff's chronic back and upper leg pain makes it difficult for him to sit or stand for more than a few minutes on most days. (*Id.*).

---

[19]Perceiving attributes of objects by touching with skin, particularly that of fingertips. (Tr. 256).

## IV.    STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d

16

473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[20] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

---

[20]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[21] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the

---

[21]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's RFC allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's RFC allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on February 18, 2002. (Tr. 16).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found that Plaintiff suffered from degenerative disc disease and status post failed spinal fusion. (Tr. 19). The ALJ also found that Plaintiff's impairments limit his ability to perform basic work activities. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and this Court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.     Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

20

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 16). The ALJ found that Plaintiff's "back impairment does not meet the requirements for vertebrogenic disorders in Appendix 1 because of the absence of persistent physical findings establishing the presence of 'appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss', as required under section 1.05(C)(2)." (Id.).

Substantial evidence exists to support the ALJ's finding that Plaintiff's impairments do not meet or equal any impairment in Appendix 1. This finding is not challenged by either party and this Court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. (Tr. 18). The ALJ found that Plaintiff's RFC precluded the following work related activities:

> Lifting more than 10 pounds occasionally; sitting and/or standing for more than a total of 6 hours in an eight hour workday or for more than 30 minutes without interruption; walking for more than a total of 2 hours in an eight hour workday or for more than 30 minutes without interruption; climbing; stooping; crouching; kneeling or balancing even occasionally; crawling more than occasionally; reaching forward greater than an arm's length more than occasionally; pushing/pulling more than occasionally; operating foot controls more than 5% of the time; performing work with or near dangerous moving machinery; performing work around unprotected heights; and performing jobs requiring driving motor vehicles when using medication.

(Tr. 16). Since Plaintiff's least demanding past relevant job required him to perform work activities

inconsistent with his RFC, the ALJ found that Plaintiff cannot perform any past relevant work. (Tr. 18).

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ determined that although Plaintiff's RFC did not allow him to perform the full range of sedentary work, there existed a significant number of jobs in the regional economy that he can perform. (Tr. 20). To make his determination, the ALJ consulted vocational expert Frank Mendrick. (Tr. 19). Mr. Mendrick stated that an individual with Plaintiff's vocational characteristics and RFC could perform the jobs of usher (1,200 jobs in the regional economy), inspection and testing (2,000 jobs in the regional economy), and cashier and ticket sales (2,000 jobs in the regional economy). (*Id.*). The ALJ found that this is a significant number of jobs. (*Id.*). Accordingly, he held that Plaintiff was not under a disability for the purposes of Title II of the Social Security Act. (*Id.*).

Plaintiff alleges disabling symptoms and limitations greater than those established by the ALJ. Plaintiff alleges that he experiences constant pain in his back, both legs, and thighs. (Tr. 30, 34). According to Plaintiff, he spends most of his day in a reclining position to cope with the pain. (Tr. 34, 36). Plaintiff also alleges that the furthest he can walk is two hundred feet, the longest he can stand is five to ten minutes, and the longest he can sit is fifteen to thirty minutes. (Tr. 34-35).

Plaintiff's pain diminishes his capacity for basic work activities to the extent that his alleged

22

functional limitations and restrictions due to his pain can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4). Thus, the ALJ must consider the information regarding Plaintiff's pain (or other symptoms) that is submitted by Plaintiff, his treating or examining physician or psychologist, or other persons. 20 C.F.R. §§ 404.1529(c)(3).

In the instant case, the ALJ found Plaintiff's RFC was justified because the objective medical evidence did not support Plaintiff's allegations of disabling symptoms and limitations. (Tr. 17). First, the ALJ noted that Dr. Spencer determined that Plaintiff's spinal fusion had failed and resulted in persistent back pain and burning in his legs. (*Id.*). The ALJ also noted that Dr. Zdeblick diagnosed Plaintiff with pseudoarthrosis. (*Id.*). These medical findings support Plaintiff's allegations of disabling symptoms and limitations.

To counteract the medical evidence that favors Plaintiff, the ALJ noted that Plaintiff's treating physician, Dr. Hartman, recorded that Plaintiff's condition from 2000 through October 2001 was basically status quo and that Plaintiff's arthritis was generally under control with medication such as Celebrex,[22] Aleve, and Hydrocodone.[23] (*Id.*). The ALJ also stated that he used Dr. Porter's July 3, 2001 Estimation of Physical Capacities report as a basis for determining Plaintiff's RFC.[24] In fact, after reviewing Dr. Porter's report with the ALJ's RFC, this Court has determined that the

---

[22]Arthritis pain reliever.

[23]A potent analgesic derivative of codeine used as an antitussive and analgesic. STEDMAN'S MEDICAL DICTIONARY 816 (26th ed. 1995).

[24]It should be noted that Dr. Porter's evaluation of Plaintiff's RFC was based solely on clinical evaluations, objective medical evidence, and diagnostic test results. Dr. Porter did not examine Plaintiff. (Tr. 257).

ALJ adopted Dr. Porter's assessment completely with the only exception being that Dr. Porter's report indicated that Plaintiff could only sit/stand for three hours in an eight hour workday, whereas the ALJ RFC's indicated Plaintiff can sit/stand for six hours in an eighter hour workday. Although this Court does not understand why the ALJ would deviate only this respect, this Court agrees with the ALJ's assessment nonetheless.

The only real report present before this Court that contradicts the ALJ's finding is from Plaintiff's treating physician – Dr. Hartman. However, the ALJ properly addresses Dr. Hartman's findings and why they were dismissed. Namely, the ALJ stated that while Dr. Hartman is "one of [Plaintiff's] treating physicians, ... Dr Porter is a specialist in the field of industrial medicine, worked with [Plaintiff] during his course of physical therapy, and was provided the results of [Plaintiff's] final functional capacities evaluation." (Tr. 18). While this Court recognizes that as a treating physician, Dr. Hartman's opinion regarding the nature and severity of Plaintiff's condition may be entitled to controlling weight, such weight is only given if Dr. Hartman's opinion is supported by the medical findings and not inconsistent with other substantial evidence in the record.[25] Dr.

---

[25]There appears to be some conflict in the Seventh Circuit on the weight a treating physician should receive in determining whether an individual is disabled or not. *Compare Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), *with Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation.'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability").

Hartman's assessment is not supported by the medical weight and is not consistent with other substantial evidence in the record (namely that of Dr. Porter) and therefore, this Court does not give Dr. Hartman's opinion controlling weight. In this case, Dr. Porter was more familiar and probably saw Plaintiff more regarding his disability then Dr. Hartman. It would be hard for this Court to discredit a specialist in the field of industrial medicine who personally saw and assessed Plaintiff and whose report is supported by the evidence. Dr. Porter's report, coupled with the medical records of the Plaintiff, is substantial evidence that supports the decision of the ALJ.

## VII.    CONCLUSION

For the reasons stated above, it is the Report and Recommendation of the Magistrate Judge that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted. The parties are given ten days from service of this Order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 9/11/03